FILED
2011 Mar-30  PM 01:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JONATHAN W. HOUGH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-09-BE-2220-NE** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 14, 2007, the claimant, Jonathan W. Hough, applied for disability insurance benefits and supplemental security income (SSI) benefits under Title II and Title XVI of the Social Security Act. (R. 14). The claimant alleges disability commencing on March 30, 2005, based on inability to concentrate for extended periods of time because of anxiety and stressful situations; partial paranoia schizophrenia; and an inability to stand for long periods of time because of knee swelling. (R. 40). The Commissioner denied the claim both initially and on reconsideration. (R. 14). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on February 6, 2009. In a decision dated May 18, 2009, the ALJ found that the claimant was not disabled as defined by the Act, and thus, was ineligible for disability insurance benefits and supplemental security income. (R. 25).

On October 16, 2009, the Appeals Council denied the claimant's request for review;

1

consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-4). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ improperly gave little weight to the portion of Dr. Fleece's opinion stating that claimant has moderate limitations with one or two episodes of decompensation; (2) whether the additional evidence claimant submitted to the Appeals Council warrants remand for review.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court must affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

2

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of  "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

Although a treating physician's opinion is generally entitled considerable weight, the ALJ

3

may accord little weight to the opinion when the evidence shows "good cause" for doing so. 20 C.F.R. §404.1527 (2000); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987) (holding the opinion of a treating physician regarding disability may be discounted by the ALJ if it is unsupported by objective medical evidence or is merely conclusory). Ultimately, however, the ALJ may reject the opinion of any physician when substantial evidence supports a contrary conclusion. *Bloodworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).

Evidence submitted to the Appeals Council is considered with the record as a whole to determine whether substantial evidence supports the ALJ's decision. *See Ingram v, Comm'r*, 496 F.3d at 1266 (11th Cir. 2007). The Appeals Council will consider new, material, and chronically relevant evidence, and will review the ALJ's decision only if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b), 416.1470(b).

## V. FACTS

The claimant has a G.E.D. and was 34 years old at the time of the administrative hearing. His work history report lists eighteen different employers and reflects a wide range of work experience, including several dine-in and fast food restaurants, several stores, a data center, Abercrombie's Tire Center, Grounds Control of Huntsville, Maple's Industries, Job Seekers, Bama Dough, and self employment. (R. 133-34). He has performed a variety of manual labor in the course of his past employment, including delivering pizza; baking bread; waiting tables, including lifting and carrying trays of food and drink; cleaning construction sites and storefronts; carrying boxes to packing lines; weeding, cutting grass, and other types of lawn service; washing dishes; pouring concrete and carrying tools; and changing tires. (R. 24, 136, 139, 148-52). The

4

claimant alleges disability commencing on March 30, 2005 based on various mental limitations

and physical limitations triggered by a knee injury.

*Mental Limitation*s

On September 9, 2003, Dr. Gauri Jain, M.D., a treating physician at Mountain Lakes

Behavioral Healthcare clinic, examined the claimant. Dr. Jain indicated claimant has had

treatment for mental illness since the age of 9. During the examination, claimant denied any use

of drugs or alcohol, but Dr. Jain noted claimant "has had [history of] smoking and snorting

cocaine, smoking and eating THC, smoking and IV use of crystal meth, IV use of heroin and trial

of acid and ecstacy and drinking beer. Substance use started at age 13 and continued for many

years." (R. 241). Dr. Jain further reported that claimant's problems with anger and poor impulse

control have resulted in his incarceration approximately 30 times, because of "fights with people

(including domestic violence)." (R. 241). Dr. Jain indicated claimant appeared fairly well

groomed and dressed; had good eye contact; reported his mood to be "fine;" and denied any

perceptual disturbances, except that he reported "feeling paranoid." Dr. Jain indicated claimant's

"thought process was logical [and his] cognition appeared to be at baseline." (R. 240-43).

On January 27, 2004, Dr. Jon G. Rogers, Ph.D., a clinical psychologist, performed a

psychological evaluation for the claimant. Dr. Rogers noted that the claimant arrived on time,

dressed appropriately, was nicely groomed, had average motor activity, was oriented, and had

good memory. Dr. Rogers gave a diagnostic impression of psychotic disorder, impulse control

disorder, cannabis abuse (in remission by self-report), anti-social personality disorder, and he

assessed a GAF of 45, indicating serious symptoms. Dr. Rogers further opined that the claimant

should be able to perform most activities of daily living, but his "ability to understand,

remember, and carry out instructions and respond appropriately to supervision, coworkers, and work pressures in a work setting would be severely impaired." (R. 180-86).

On February 13, 2007, three years later, claimant saw Dr. Younus M. Ismail, M.D., a consulting internist from Scottsboro Quick Care Clinic, after being referred by Human Resources. Claimant was advised to restart medication for his history of depression and anxiety and testing positive for cocaine and marijuana. The next day, on February 14, 2007, claimant was seen on a visit at Mountain Lakes clinic, reporting paranoia, auditory hallucinations, and a relapse to crack use two months earlier. This visit coincided with the filing of his current application for disability and occurred shortly after an arrest for possession of drugs in January of 2007. (R. 221-43).

On March 16, 2007, claimant presented on referral from Human Resources that his children were taken away from him because of his drug use. Records also indicate treatment for anti-impulse control, mania, and substance abuse, but thereafter, treatment records reflect active participation in group therapy.

On April 17, 2007, Dr. Rogers gave a second psychological evaluation for the claimant. Claimant endorsed experiencing depression, a 30-pound weight gain, insomnia, suicidal ideas, difficulty concentrating, irritability, muscle tension, trouble falling asleep and staying asleep, trembling, fear of losing control, fear of going crazy, feeling guilty and hopeless, and fear of dying. Dr. Rogers noted that claimant was experiencing manic symptoms, instable interpersonal relationships, impulsivity, drug behavior, and problems with anger. Dr. Rogers also noted claimant's appearance was good, articulation was normal, conversation was normal, mood appeared normal, and that orientation as to time, place, and person was good. However, Dr.

6

Rogers noted claimant's judgment and insight was poor. Dr. Rogers gave a diagnostic impression of polysubstance dependence (in remission by self report), intermittent explosive disorder, psychotic disorder, anti-social personality disorder, and assessed a GAF of 45. Dr. Rogers further opined that the claimant's endorsed problems of difficulty concentrating and not being able to be around people would affect his employability. Dr. Rogers concluded that claimant is able to function independently but his quality of daily activities is below average. (R. 247-54).

On April 26, 2007, Dr. Eugene E. Fleece, Ph.D., a state agency psychologist, examined the claimant. Dr. Fleece filled out a Psychiatric Review Technique. He opined that an RFC assessment was necessary and categories upon which the medical disposition is based were 12.02 (organic mental disorders), 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). Dr Fleece noted claimant recently was back on "crack" and to expect perceptual or thinking disturbances, change in personality, and disturbance in mood. Dr. Fleece also found claimant exhibited pathologically inappropriate suspiciousness or hostility, intense and unstable interpersonal relationships and impulsive and damaging behavior, possibly because of a chronic degree of paranoia associated with drugs or a lack thereof. (R. 259-68).

Under "paragraph B" criteria, Dr. Fleece noted that the degree of claimant's limitations were "moderate" in terms of (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; (3) difficulties in maintaining concentration, persistence, or pace; and (4) "one or two" episodes of decompensation, each of extended duration. (R. 269). Under "paragraph C" criteria, Dr. Fleece found "[e]vidence does not establish the presence of the 'C' criteria." (R. 270).

Dr. Fleece also completed a Functional Capacity Assessment, indicating that claimant has

the ability to understand and recall simple duties and procedures, execute simple 1-2-3 step commands, and concentrate for 2-hour periods with routine breaks. He needs supervisory flexibility in work hours and scheduling, and would experience some anxious distractability if work was in very close proximity to numerous others, but affect would fade with exposure. Dr. Fleece opined that claimant would miss one day of routine duties monthly because of his psychotic disorder. Appropriate jobs would involve no contact with the general public, direct, non-confrontational supervision. Dr. Fleece further opined that claimant's "behavior would occasionally distract others, but not to the point of significant lost production." (R. 275). Claimant "could adapt to workplace changes which are simple or gradually introduced or well-explained," and was "capable of making simple workplace decisions and plans adequately." (R. 275). In his Consultant's Notes, Dr. Fleece noted and considered claimant's prior medical visits with Mountain Lakes Behavioral Clinic, Dr. Ismail, Huntsville Hospital, and two visits with Dr. Rogers. (R. 271, 275).

On January 8, 2008, Melinda Clark, a staff member at Mountain Lakes Behavioral Healthcare, filled out a Summary of Progress for the claimant. The summary read, "John graduated today. Good input to other members. Good sharing. Reports he will be finished with all requirements by February. Appears to be doing very well. Insightful and recovery minded." (R. 321).

On March 11, 2008, Eleni Honderich, M.ED, a mental health counselor at Mountain Lakes Behavioral Healthcare Clinic, completed a Progress Note for the claimant. Counselor Honderich noted claimant suffered problems of anger impulse control, mania, substance abuse dependency. His symptoms were interpersonal problems, poor judgment, inflated self-esteem,

8

impaired functioning, and excessive risk taking. However, Counselor Honderich noted claimant's physical presentation, thought/perceptual disturbances, speech, mood/affect were all within normal limits and both insight and judgment were good. Additional notes referenced the claimant speaking about "continuing to go to meetings, speaking with a sponsor, [and] going to church," while also reporting compliancy with medication with no side effects. (R. 315-16).

On April 1, 2009, at the ALJ's request, Dr. Carol Walker, Ph.D., a neuropsychologist, evaluated claimant for a consultative examination. Claimant reported that he was last treated at Mountain Lakes Community Health Center about a year prior to the examination. Claimant advised Dr. Walker he could hear screaming voices in his head, exhibited explosive anger, and loss of control. Claimant stated he last used marijuana three weeks prior to the exam, but had not used cocaine in two years. Claimant stated that Mountain Lakes refused to treat him for his other conditions because of his "dirty" urine screen. Dr. Walker noted claimant's drug history was different than what was provided to Dr. Rogers, in that claimant acknowledged being addicted to methamphetamine. Dr. Walker opined that claimant was fully oriented and his affect was appropriate to the topic of conversation. Dr. Walker indicated claimant exhibited no psychomotor agitation or retardation and "his abstraction abilities appear[ed] to be somewhat impaired but his judgment and insight appeared unimpaired." (R. 361). Among several other examinations, Dr. Walker administered a Structured Inventory of Malingered Symptoms test to evaluate claimant's complaints of psychiatric symptoms. The scores of this test reflected "'extreme' exaggeration." (R. 363). She opined that the diagnoses that best fit claimant's presentation are antisocial personality disorder and polysubstance dependence. She said his mental impairment is related to his personality disorder and is not because of any organic or psychiatric symptoms. Finally, Dr.

9

Walker stated that the above analysis is based on claimant's medical history from the Disability Determination Service.  (R. 358-64).

*Physical Limitations*

Claimant suffered a "puncture wound" to his left knee in September 2006. He first visited the emergency room and was later admitted to the hospital due to cellulitis and an abscess in his left knee, which was diagnosed as staphlococcus.  Three days after the injury, radiology records from Jackson County Hospital reflect that "[t]here is no evidence of a fracture, dislocation, or joint effusion" and "no acute bony abnormality." (R. 191).  He was prescribed antibiotics and released. (R. 187-220).

On March 12, 2007, the claimant completed a Physical Activities Questionnaire for the Disability Determination Service. Claimant indicated that his daily activities are very limited, and he is unable to do any shopping or errands because of his problems walking or standing for long periods of time and his inability to put weight on his knee. Claimant stated that he is unable to do yard work, go fishing, and complete any housework to take care of his daily tasks as a father. He further claimed that walking is difficult without crutches and "standing is nearly impossible for longer than a few minutes." (R. 115). Claimant stated that he is no longer able to help with chores or childcare and that he needs assistance showering and dressing because of his inability to stand. Because of his knee brace, claimant cannot easily bend his knee, and therefore, his girlfriend April helps him stand and helps with the kids as much as possible. Claimant also needs someone to drive for him because his car is a stick shift and he cannot push the clutch with his knee injury; therefore, he needs to be driven to and from his doctor's appointments. Finally, claimant indicated that he can perform most activities for a very short time, about five minutes,

10

before having to take a break because of his painful knee condition. (R. 115-20).

On March 13, 2007, the claimant completed a Daily Activities Questionnaire for the Disability Determination Service. Claimant wrote, on an average day, he "sit[s] on the couch and reads," watches television, and tries to help around the house as much as his knee injury allows. Claimant indicated that his illness caused changes in his sleeping habits because he needs to take Seraquel to help him sleep or else he will stay up until two or three in the morning. (R. 122-26).

Claimant further wrote in the questionnaire that without taking medication he would have thoughts of hurting others on a daily basis. Claimant wrote that he "lost all of [his] friends and only speak[s] to [his] family on very limited occasions because of [his] anger." (R. 124). Claimant can no longer take care of his children because of his anger problems. Occasionally, claimant attends NA meetings to listen and share. Claimant claims he is "unable to be around people for very long" because he thinks they are "out to get" him. (R. 124). Claimant wrote he quit going out and stays home because he cannot deal with people. Claimant wrote he did not have problems concentrating but cannot finish most times because he loses interest quickly. Claimant wrote that he needs to be reminded to take his medication because he tends to forget. Claimant explained that his condition keeps him from working because he "cannot keep the people from trying to get me. So I freak out and get fired. But they aren't really trying to get me." (R. 125). Claimant wrote that he tried to work since becoming ill but "freaked out" and got fired from all of his jobs because he nervously thought every one was plotting against him and lost control of his anger and tried to hurt people. (R. 122-26).

On March 14, 2007, Dr. Mark A. Leberte, M.D., an orthopedic physician at Huntsville Hospital, examined the claimant. Dr. Leberte noted claimant strained his left knee and then

11

injured it with a puncture wound. Dr. Leberte made an incision and drained the knee. The

hospital MRI of the left knee revealed

> there is edema within the soft tissues overlying the knee. Anterior and slightly
> medial to the patella there is a fluid collection measuring 1 cm just below the
> skin surface. This is felt to be due to an abscess in this patient with known
> cellulitis. There is no evidence of osteomyelitis. The collateral and curciate
> ligaments appear intact and no meniscal tear is seen. No osseous abnormality is
> noted. The patella and its ligamentous complex is unremarkable.

(R. 197-220).

On April 18, 2007, Dr. Ismail, M.D., again examined the claimant during a consultative

physical examination at the request of the Administration. He stated, "[t]he patient is a 31-year-

old male with a history of knee injury, who came to the office for the disability examination. The

patient does not have much limitations in the range of movement [sic] has some pain on the left

knee mainly because of the surgery." Dr. Ismail further opined that claimant is suffering from

bipolar disorder and schizophrenia, and that proper psychiatric evaluation, subsequent

management, occupational, and physical rehabilitation will be beneficial. (R. 255-57).

*ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income,

the claimant requested and received a hearing before an ALJ. (R. 14). At the hearing, claimant

testified that he is unable to stand for long periods of time and that he has to prop his foot up

because his knee swells. Claimant testified that he has a hard time dealing with stressful

situations, such as co-workers and bosses. He also testified not being able to concentrate long

enough to keep a job because of his anxiety, partial paranoia, and schizophrenia. The ALJ asked

claimant what medication he took, and claimant testified taking Trileptal, Seroquel, Wellbutrin,

12

and Ibuprofen 400s. Claimant further testified that his medication works "in certain circumstances." For example, he said he must stay isolated and prefers not to go into a crowded building, a public event, or a restaurant, because when he is exposed to stressful situations, his emotions "tend to override his medication." (R. 40).

The ALJ further questioned claimant, asking him to identify any prior work and drug history. Claimant testified to prior use of cocaine, marijuana, and other things such as inhalants. Claimant testified serving time in prison when he was 18 and another account of three days in jail for possession of drug paraphernalia. Claimant testified he has had about 20 jobs over the past 15 years, and most of them ended with problems such as assaulting other employees or managers because he felt they were plotting against him. Claimant testified he does not go to crowded places such as Wal-Mart, restaurants, movies, or even his children's school activities, because these settings are stressful and can cause his mood swings. Claimant admitted that sometimes his family members even cause him stress, especially if he did not take his medication or could not afford his medication. Claimant testified he was separated from his wife, and described his children's behavior as "more than I can handle" when he is not on his medication. When he was unable to buy his medication, the DHR intervened and took his children because of his mental problems. (R. 41-51).

Claimant further testified that he attended NA meetings five times a week during the evenings and that he has been clean for a while. Claimant testified in the last 15 years he had been arrested 40 times for battery on law enforcement, violation of probation, etc. Claimant testified to hearing voices that others cannot hear that tell him to hurt himself or others, but also testified that medicine helps him control the voices, allowing him to decipher reality. Claimant

13

testified his biggest problem is being around other people or being stressed because he cannot control his mood swings and he acts impulsively, sometimes losing all control.  (R. 45-47).

The ALJ then posed to claimant if he were offered a job and his only responsibility would be to sit in a room by himself and look at surveillance, would he would be able to perform it. Claimant responded that he could perform such a job only for a limited time because of his knee swelling, having "to prop it up approximately 30 minutes every hour or two," and because he could only concentrate for one to two hours before losing touch with reality. (R. 50).

The ALJ asked a vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The VE testified that, given all of the factors, the hypothetical individual would be able to perform the requirements of representative occupations such as packager, with 500 jobs regionally and 100,000 nationally; bagger with 300 jobs regionally and 100,000 nationally; and film processor with 300 jobs regionally and 100,000 nationally. (R. 25).

*ALJ Decision*

The ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals any section of the listing of impairments. The ALJ found claimant's mental impairments, considered singularly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, 12.08, and 12.09. The ALJ had to consider whether "paragraph B" criteria were satisfied. The ALJ found "paragraph B" criteria were not satisfied, because claimant takes care of his children, visits with friends, attends NA meetings and church, goes fishing, watches TV, and reads. Additionally, the therapist at Mountain Lakes noted that claimant was doing very well, was insightful, indicated good insight and judgment,

14

actively participated in group therapy, and even shared his life story. The ALJ also found that clinical psychologist, Dr. Jon Rogers, noted claimant was oriented and had good memory.

The ALJ found that claimant drove to Dr. Walker's examination accompanied by his three preschool age children and stated that he "is responsible for his children on a daily basis," which is consistent with his report to the ER that "his job is taking care of the children." The ALJ noted that claimant's youngest child is four months old. As a result, the ALJ based his findings on the evidence and concluded that the claimant "has a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace; and no showing of decompensation of extended duration." (R. 19). Therefore, because claimant's mental impairments did not cause at least two "marked" limitations and "repeated" episodes of decompensation, both of extended duration, the ALJ found that the impairments did not satisfy "paragraph B criteria." (R. 19).

Applying the pain standard to claimant's subjective symptoms of disabling physical and mental impairments, the ALJ found that objectively, the "medically determinable impairments could reasonably be expected to cause the alleged symptoms"; yet he found the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms" were not credible to the extent they were inconsistent with the residual functional capacity assessment. (R. 21). Moreover, the ALJ found that the objective medical record did not support claimant's subjective complaints of disabling physical and mental impairments, and in general, he discredited the claimant's credibility. The ALJ decided that the objective record "contrasts sharply" with claimant's complaints of significant limitations because of injury to his left knee. Specifically, he noted "[t]he record shows the claimant first injured his left knee and developed a

15

staph infection in September 2006, well over a year after he alleges that he stopped working and became disabled." (R. 21). The ALJ deduced that the "claimant undoubtedly made a full recovery" because the record did not reflect any further treatment. The ALJ also emphasized that in April 2007, claimant told Dr. Ismail that he "does not see a regular doctor." As further support to his conclusion that claimant had reached a full recovery, the ALJ considered the "essentially normal examination" by Dr. Ismail that diagnosed only a "little" limitation in the range of movement of claimant's left knee, and subjective complaints of pain in that knee. (R. 21).

As to claimant's mental problem, the ALJ observed that the record demonstrated "off-and-on treatment" at Mountain Lakes Behavioral Healthcare Clinic from 2003 to January 2004 for substance abuse with depression, psychotic disorder, and impulse control disorder. No further treatment records existed until February 2007, around the time claimant was arrested for drug possession and filed his disability application. The court found significant that the time frame was two years after claimant alleged he became disabled. Claimant did not return for treatment until March 2007, two months later, when he was presented on referral from Human Resources, only after his children were removed from him because of his drug abuse. Thereafter, claimant regularly went to therapy, including group therapy sessions. He graduated from the program on January 8, 2008, but on his next visit, he was unable to give a urine drug screening and was advised he must submit a urine sample within 24 hours or his failure to do so would be deemed a refusal. The ALJ noted that the record does not reflect whether the urine sample was submitted, but that claimant told his neuropsychologist, Dr. Walker, that he could no longer be treated at Mountain View because of his "dirty" urine screen. The ALJ confirmed Mountain Lakes treatment records reflected that on claimant's last visit, he "talk[ed] in typical vague terms a

16

possible drug-seeker would about not remembering quite exactly the name of the PRN anxiolytic prescribed by the ER." (R. 21).

The ALJ ascertained that Dr. Rogers did not perform any testing, but relied on the subjective report of symptoms and limitations provided by the claimant. As a result, the ALJ found very good reasons exist for questioning the reliability of the claimant's subjective complaints. For these reasons, the ALJ gave Dr. Rogers's opinion(s) very little weight. (R. 22). Conversely, the ALJ determined Dr. Walker is a certified neuropsychologist with extensive experience in performing validity testing. Therefore, ALJ gave her opinion great weight. (R. 22-23).

The ALJ located many documents throughout the medical record that contained multiple conflicting or exaggerated statements, which further eroded the claimant's credibility in his judgment. For example, claimant reported that he had spent half of his life in jail on twelve assault charges and three felonies. At the same time, claimant told Dr. Rogers that he had spent 15 years in prison for killing an 11-year-old when he was 9 years old. Despite that statement, claimant attended high school. Another inconsistency that troubled the ALJ was claimant's allegations that he hears voices and hallucinates. However, the most recent treatment records specifically reported that he was not hearing voices or having hallucinations. In fact, the records revealed that claimant was doing well and even graduated from the treatment program he had been attending. Claimant's own statements showed that his anger outbursts and rage were "controlled with medication." The ALJ found the claimant had been "very vague about his employment history." For example, claimant alleged that he stopped working when his disability began on March 30, 2005. However, he told Dr. Ismail that he quit working at a mechanic job

17

after his knee surgery in September 2006. Claimant also testified that "he had never worked for more than three months at any job," but he told Dr. Rogers in January 2004 that he worked at Ruby Tuesday's as a server for almost a year, from October 2002 to July 2003. The ALJ also considered Dr. Walker's observation that claimant's hands and nails were "greasy and callused," which may suggest he was currently working. Finally, the ALJ noted the fact that the claimant reported "that he took care of his [three] very young children while attending college is in and of itself contradictory with the claimant's allegations of disabling symptoms and limitations." (R. 23).

The ALJ gave weight to the part of the state agency consultant opinion in May 2007 saying the claimant can perform a range of medium work because it was consistent with the record; however, affording the claimant the benefit of the doubt, the ALJ reduced the exertional level to a light range. The ALJ gave little weight, however, to a portion of the the April 2007 opinion of the state agency psychologist that found the claimant had "moderate functional limitations with one or two episodes of decompensation," because such imitations were based solely upon Dr. Rogers's report, while more recent testing indicated that the claimant's alleged symptoms were exaggerated. (R. 23).

The ALJ also gave weight to the consultant's opinion, which found that the claimant possessed the ability "to understand and recall simple duties and procedures, execute simple 1-2-3 step commands, [and] concentrate for 2-hour periods with routine breaks." The ALJ accepted the consultant's opinion that claimant could request supervisory flexibility in his work hours and schedule, and that he would experience some anxiety and distraction if work was in very close proximity to many others, but that this effect would fade with exposure. The consultant further

opined that claimant would have to miss one day of routine duties per month because of his psychotic disorder; that he should not have contact with the general public; that he could handle direct, non-confrontational supervision; that his "behavior would occasionally distract others, but not to the point of significant lost production"; that he would be adaptable to workplace changes that are simple, gradually introduced, or well-explained; and that he is "capable of making simple workplace decisions and plans adequately." (R. 23).

The ALJ stated that he carefully considered the entire record, including the claimant's testimony, and concluded that the claimant retained the residual functional capacity to perform "light" work (lifting no more than 20 pounds occasionally and 10 pounds frequently) with a sit/stand option; limited use of the lower extremities for pushing and/or pulling; occasional climbing of ramps/stairs, and balancing stooping, kneeling, crouching, and crawling. At the same time, he found the claimant should never climb ladders/ropes/scaffolds, should not be exposed to extreme cold/heat, and should not work near unprotected heights or dangerous machinery. The ALJ also found the claimant had the mental capacity "to perform simple workplace duties/procedures; concentrate for [two] hour periods; [perform] no work close to others; may be absent [one] day per month due to psychiatric disorder; [should have] no contact with the general public; [should have] no interaction with the public; [should] deal with things not people; and [do] isolated work with occasional supervision." (R. 23-24).

Based on these findings, including the testimony of the vocational expert, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity," the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. As a result, the ALJ ruled a finding of

19

"not disabled" appropriate.

## IV.  DISCUSSION

**A.      Rejecting The Opinion Of A Treating Physician**

Claimant argues that the ALJ erred in giving little weight to the portion of Dr. Fleece's opinion, stating that claimant has moderate limitations with one or two episodes of decompensation. (R. 23). The claimant asserts that the ALJ improperly failed to state on what other opinion he might be relying on because he failed to identify where in the record the inferences were drawn by the same state agency psychologist whose opinion he had just rejected.

This court must determine whether substantial evidence supports the ALJ's decision not to rely on the portion of Dr. Fleece's disability evaluation that was based on Dr. Rogers's report. Although a treating physician's opinion is generally entitled considerable weight, the ALJ may accord little weight to the opinion when the evidence shows "good cause" for doing so. 20 C.F.R. §404.1527 (2000); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987) (holding the opinion of a treating physician regarding disability may be discounted by the ALJ if it is unsupported by objective medical evidence or is merely conclusory). Ultimately, however, the ALJ may reject the opinion of any physician when substantial evidence supports a contrary conclusion. *Bloodworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).

Claimant asserts that the ALJ expressly gave little weight to the opinion of Dr. Fleece, the state agency psychologist. However, this court finds to the contrary. The ALJ properly considered Dr. Fleece's assessment in determining the claimant's residual functional capacity. The ALJ's opinion indicates that he ALJ accepted Dr. Fleece's medical diagnosis of claimant's abilities, but gave little weight to Dr. Fleece's assessment that "claimant has moderate functional limitations

with one or two episodes of decompensation." The ALJ's reason for rejecting this portion of his assessment was because "these limitations were based upon Dr. Rogers's report and more recent testing indicates the claimant was exaggerating symptoms." (R. 23). Additionally, the ALJ found claimant actively cares for his young children while attending college classes, activities which conflict with his alleged disability claims.

The ALJ then weighed Dr. Fleece's assessment with other contradictory evidence in the medical record. While the ALJ accepted that the claimant had some physical and psychological difficulties, the ALJ could not find that these difficulties supported the restrictive functional restrictions in light of the claimant's own testimony and the testimony of others. Notably, two state agency medical experts -- Dr. Ismail, M.D., and Dr. Walker, Ph.D., a neuropsychologist -- concluded after consultative examinations that the claimant had no definitive physical and mental conditions at the time of the initial and reconsideration determinations. (R. 255-58, 357-66).

For example, the record reveals claimant first injured his knee and developed a staph infection in September 2006, well over a year after he alleged that he stopped working and became disabled; however, he undoubtedly made a full recovery as the record does not document any further treatment. The claimant also told Dr. Ismail in April 2007 that he does not see a regular doctor. Dr. Ismail concluded that there was "little" limitation in the range of movement in the left knee, but claimant had some pain mainly because of the surgery. (R. 255-58).

Furthermore, Dr. Walker opined claimant was fully oriented, exhibited no psychomotor agitation or retardation, his abstraction abilities appeared to be somewhat impaired, but his judgment and insight appeared unimpaired. Dr. Walker noted claimant was only marginally cooperative with the clinical interview and gave "poor effort" on testing. Among several other

examinations, Dr. Walker administered a Structured Inventory of Malingered Symptoms test to evaluate claimant's complaints of psychiatric symptoms. The scores of this test reflected "'extreme' exaggeration." (R. 363). As a result, Dr. Walker opined that the claimant's subjective complaints cannot be supported. She noted that "the diagnoses that most fits [claimant's] presentation is antisocial personality disorder and polysubstance dependence." Dr. Walker concluded claimant's mental impairment is "related to his personality disorder" and not because of any discernable "organic or psychiatric symptoms." (R. 363-64).

By contrast, Dr. Fleece's finding that claimant has moderate limitations with one or two episodes of decompensation were based on Dr. Rogers's report, but Dr. Rogers did not perform any objective medical testing. Instead, he relied on the subjective complaints of symptoms and limitations provided by the claimant. For these reasons, the ALJ considered Dr. Fleece's opinions, but ascribed them little weight. Conversely, the ALJ found that Dr. Walker is a certified neuropsychologist with extensive experience in performing validity testing, and she actually administered several objective neurological tests on claimant to measure his subjective complaints; therefore, gave her opinion great weight. (R. 22-23).

Good cause, therefore, existed for partially rejecting Dr. Fleece assessment, and the ALJ may properly reject any physician's opinions for good cause where contradictory opinions exist from other sources are present or if the opinion is internally inconsistent.  20 C.F.R. § 416.927(b), (d)(4)(2001); *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). Here, the ALJ showed good cause in his opinion by citing the claimant's own subjective testimony and comparing it to testimony from other sources, based on objective medical evidence. This court agrees that the internal inconsistencies recognized by the ALJ are supported by the record and are

22

significant to a credibility analysis of claimant's complaints.

Thus, contrary to the claimant's assertion, the ALJ properly considered Dr. Fleece's assessment but found, within his discretion, that the suggested mental restrictions were contrary to the cumulative testimony and the claimant's own daily activities.

**B.      Additional Evidence**

Claimant next claims that the Appeals Council failed to consider additional evidence the claimant submitted following the ALJ's decision. The new evidence in question consists of Dr. R. Douglas Peters' February 2007 psychological evaluation. (R. 374-78).

Evidence submitted to the Appeals Council is considered with the record as a whole to determine whether substantial evidence supports the ALJ's decision. *See Ingram v, Comm'r*, 496 F.3d at 1266 (11th Cir. 2007). The Appeals Council will consider new, material, and chronically relevant evidence, and will review the ALJ's decision only if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b), 416.1470(b).

This court finds claimant's argument is without merit because the Appeals Council explicitly considered the additional evidence and denied review. The additional evidence included representative's correspondence dated July 24, 2009 and records from R. Douglas Peters, Ph.D., dated February 17, 2007. (R. 4). Specifically, on October 16, 2009, the Appeals Council wrote to the claimant in its Notice of Appeals Council Action specifically mentioning the consideration of additional evidence:

> "After considering the additional information, we found no reason under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review. This means that the Administrative Law Judge's

decision is the final decision of the Commissioner of Social Security in your case. . . . In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision."

(R. 1, 2).

The court finds that the Appeals Council properly considered the additional information and denied claimant's request for review.

## V. CONCLUSION

Based on the court's evaluation of the evidence in the record and the submissions of the parties, the court finds that the Commissioner's final decision applies the proper legal standards and is supported by substantial evidence. Accordingly, the decision of the Commissioner of the Social Security Administration will be AFFIRMED by separate order.

DONE and ORDERED this 30th day of March, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

24